_____

KEVIN N. SEARS,

                            Plaintiff                      **DECISION AND ORDER**

-vs-

                                               1:18-CV-00950 CJS

ANDREW M. SAUL,
Commissioner of Social Security,

                            Defendant.

_____

## APPEARANCES

For the Plaintiff:           Felice A. Brodsky
                           556 South Transit Road
                           P.O. Box 557
                           Lockport, New York 14095

                           James P. Ratchford
                           1231 Delaware Avenue, Suite 103
                           Buffalo, New York 14209

For the Defendant:         Peter W. Jewett
                           Social Security Administration
                           Office of General Counsel
                           26 Federal Plaza, Room 3904
                           New York, New York 10278

## INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant"), which

denied the application of Kevin N. Sears ("Plaintiff") for Social Security Disability Insurance

("SSDI") benefits.   Now before the Court is Plaintiff's motion (Docket No. [#15]) for judgment

on the pleadings and Defendant's cross-motion [#17] for the same relief.   For the reasons

discussed below, Plaintiff's application is granted, Defendant's application is denied, and this matter is remanded for further administrative proceedings.

FACTUAL BACKGROUND

The reader is presumed to be familiar with the facts and procedural history of this action. The Court will summarize the record only as necessary for purposes of this Decision and Order.

In 1986 Plaintiff graduated from high school, and in 1993 he completed a "tool and die apprenticeship." (295). Plaintiff subsequently began working for a machine shop, where he remained for more than twenty years. (266-273).[1] In that job, Plaintiff had to frequently lift 50 pounds and occasionally lift 100 pounds. (286, 296).

In 1994, Plaintiff first began to experience back pain, and in 2000 or 2001 the pain began to affect his activities. (310). In 2003, Plaintiff had spinal cord fusion surgery at the L5-S1 level. After the surgery Plaintiff gradually resumed his usual full-time work as a machinist. (47).

On May 2, 2012, Plaintiff told his primary care doctor, Gordon Tussing, M.D. ("Tussing"), that he was having severe lower back pain (8/10), that improved somewhat with medication and rest. (663). Plaintiff described a painful burning sensation that made walking and bending difficult. (663). Tussing noted that Plaintiff's back was tender to palpation. (663).

On February 11, 2013, Plaintiff was examined by spinal surgeon John Pollina, M.D. ("Pollina"), upon a referral from Dr. Tussing. Pollina reported that Plaintiff had a "broad-base

_____

[1] The apprenticeship may have been with the same employer, because at the second ALJ hearing Plaintiff testified that he worked at the same job for "26 straight years." (81).

disc herniation at L4-5." (562).   Pollina stated that epidural injections and chiropractic treatments had only given Plaintiff short-term relief, [2] and that Plaintiff was "eager to continue working with various treatment options to better control his pain." (562).   Pollina observed that apart from Plaintiff's pain, he had good strength in his legs and negative straight-leg raising, but an antalgic gait. (529).   Nevertheless, due to the failure of conservative measures Pollina recommended that Plaintiff "undergo a transforaminal lumbar interbody fusion at L4-L5 for his lumbar degenerative disc disease." (361).

On April 30, 2013, Pollina performed the spinal fusion surgery. (361).   In his surgical notes, Pollina stated that surgery was necessary because Plaintiff's pain was "quite severe, although he is functional despite this." (529).   During the surgery, Pollina reported that the "L4-5 facet was noted to be very gapped and unstable," which he addressed by removing the damaged disc[3] between L4-5 and replacing it with a spinal-fusion cage. (363).   At the time of discharge from the hospital, Plaintiff was using a walker to ambulate. (422).

On May 17, 2013, Plaintiff returned to see Pollina for a post-operative check. (526). Pollina indicated that Plaintiff was wearing a back brace, and that he should continue doing so.   Pollina directed Plaintiff to use Ibuprofen and Lortab for pain as needed.   Upon examination Pollina reported that Plaintiff had excellent strength in his lower extremities and negative straight-leg raising bilaterally. (526).

On July 5, 2013, Plaintiff returned to Pollina's office, and was noted to be making slow post-operative progress. (521).   Plaintiff continued to have pain in the back and buttocks,

---

[2] Regarding such conservative treatment, Pollina reported, "[H]e had an epidural injection and a full course of physical therapy with little relief of his symptoms.") (530).
[3] See, Pathology Report (506).

3

with occasional pain, tingling and numbness in his feet. (521). Plaintiff was taking Lortab as needed for pain. Plaintiff had normal strength and reflexes in his legs. (522). Pollina opined that Plaintiff was "progressing well post-operatively." (521). Pollina encouraged Plaintiff to slowly increase his activity level. (522).

On August 7, 2013, Plaintiff returned to Pollina's office, still complaining of low back pain radiating into his buttocks. (519). Plaintiff had been increasing his activity and walking several blocks per day, but was also having increased pain, for which he was taking Ibuprofen and Lortab at needed. (51). Plaintiff was also receiving deep-tissue massage, but it provided little relief. (519). Plaintiff mentioned that he was eager to return to work, but was unsure whether he could "tolerate the activity level that is required for his job." (519). Upon examination, Plaintiff had "excellent strength, reflex and sensory exam in bilateral lower extremities," and negative straight-leg raising bilaterally. (520). X-ray testing showed excellent placement of the spinal-fusion cage and good bone growth around the cage. (520). Pollina recommended that Plaintiff begin physical therapy. (520).

On September 4, 2013, Plaintiff returned to see Dr. Pollina. Plaintiff reported having less pain overall and no radicular pain in the legs, but indicated that he still had pain and soreness depending on his activity level. (534). Plaintiff further reported walking more and trying to wean himself from using Lortab. Pollina reported that Plaintiff had participated in physical therapy but felt that it did not help much and sometimes made him feel worse. (534). Consequently, Pollina indicated that Plaintiff should stop physical therapy, since "it seems to be making him worse." (535). Plaintiff had full strength in his lower extremities and negative straight-leg raising. (535). Plaintiff indicated that he did not think he could return to his usual work, and Pollina agreed that Plaintiff should not do so. (535). ("[W]e are in agreement with

this.").

Plaintiff did not return to work following his surgery on April 30, 2013. On September 19, 2013, Plaintiff applied for SSDI benefits, alleging that he became disabled on April 30, 2013. (255). Plaintiff claimed to be disabled due to continuing lower-back pain following his two spinal-fusion surgeries. (294).[4]

On October 25, 2013, Plaintiff underwent an internal medicine examination by consultative examiner Abrar Siddiqui, M.D. ("A. Siddiqui") at the Commissioner's request. (546-549). Siddiqui reported that Plaintiff "had a history of low back pain for the last 20 years," and had underdone two spinal surgeries. (546). Siddiqui reported that Plaintiff was presently complaining "of low back pain, 7/10 in intensity, sharp, dull, achy in nature," "radiating to both hips and legs, and associated with tingling, numbness, and weakness." (546). Plaintiff reportedly told Siddiqui that he was able to cook for himself and his wife twice per week, that he was able to go grocery shopping once per week for one hour, and that he was able to care for his own personal needs and hygiene, but that his wife performed the cleaning and laundry. (547). Siddiqui reported that upon examination Plaintiff was morbidly obese and had restricted movement in the lumbar spine, negative straight-leg raising bilaterally and full strength in the lower extremities. (548). Siddiqui's medical source statement was as follows: "On the basis of the current physical examination, there are *moderate limitations in the claimant's ability to sit, stand, lift, push, pull, or carry heavy objects*. The morbid obesity also contribute[s] to the above mentioned limitations." (549) (emphasis added).

---

[4] Plaintiff had two surgeries on his spine, one on May 3, 2003, and another on April 30, 2013. (299). Both surgeries were performed by Pollina. (299).

On January 17, 2014, Pollina reported that Plaintiff was "still having back pain and occasional numbness and tingling through his legs." (587).   Pollina stated that Plaintiff was attending physical therapy, receiving massage therapy and taking "Lortab fairly regularly," but was still having discomfort most days. (587).   Pollina opined that the spinal fusion surgery had been successful, but that "the additional fusion level [had likely] changed [Plaintiff's] biodynamics in his lumbar spine and his adjacement segments are likely contributing to his current pain." (588).   Pollina prescribed Lyrica for pain management. (588).

On April 14, 2014, Plaintiff went to Pollina complaining of headaches and neck pain in addition to continuing low back pain.   Pollina reported that Plaintiff was taking Lyrica for his back pain, but that it was not giving him "substantial relief." (579).   Plaintiff also reported that his pain medication made him feel tired. (579).   Pollina indicated that Plaintiff had successfully "progressed into complete arthrodesis [(surgical immobilization)] postoperatively from his prior fusions at L4-L5 and L5-S1," but was still having low back pain. (580).   However, based on the results of MRI testing Pollina did not think there was presently any nerve compression or any need for further "neurosurgical intervention," so he referred Plaintiff for pain management treatment. (580).

Subsequently, Plaintiff began regular treatment with pain management specialists Jafar Siddiqui, M.D. ("J. Siddiqui") (not to be confused with A. Siddiqui, who conducted the consultative examination) and Elizabeth Hanretty, PA-C ("Hanretty"), who provided a variety of treatments including pain medications and steroid injections.

On May 19, 2014, Tussing examined Plaintiff and reported "tenderness to palpation on the ParaVertebral B/L Spasm L2-S1.   Lumbar spine revealed [an] antalgic and flattened deformity." (652).   Tussing made similar observations on January 20, 2014. (655).

On August 18, 2015, Hanretty reported that Plaintiff would be able to return to work part-time with a light-duty restriction, effective August 21, 2015. (613). Hanretty stated that Plaintiff would be limited with regard to twisting, bending, squatting and lifting (maximum 20 lbs). (613). Hanretty further stated that Plaintiff could only work a "maximum of 4 hours per day," five days per week. (613).

As mentioned earlier, Plaintiff stopped working in April 2013. Thereafter, Plaintiff did not work during the remainder of 2013 or at all during 2014. (38). However, in or about August 2015, Plaintiff went back to work at the machine shop, in a modified position that the company created for him. (38). On this point, Plaintiff stated:

> Well, I just – they kind of made a position for me at work. It wasn't my normal work that I used to do. I helped sort parts, and I did some paperwork, and I verbally coached some of the guys, the newer guys that were working there.
> ***
> It wasn't really a position that they normally have, they just helped me out I think because I was there for so long that they let me do light duty things. There's times I would just sit around and do nothing.

(38, 48).[5] When the ALJ asked Plaintiff what he did specifically during this period, apart from supervising employees, Plaintiff stated, "[T]hey had a couple of new guys and I would just kind of explain to them, you know, what jobs needed to be done, or I would take care of the – a little bit of the paperwork for them." (82).

On November 9, 2015, while Plaintiff was still working in this limited capacity, Hanretty reported that Plaintiff was continuing to complain of pain in the lower back, radiating into the buttocks, "right greater than left." (706). Plaintiff described the pain as "burning," "tingling"

---

[5] *See also*, (67) ("It was a couple of months I tried. I was there, wasn't even really like doing it. I was kind of like supervising guys, trying to show them what to do, how to do it, that kind of thing.").

and "aching" that became worse with bending, lifting, sitting, standing and twisting. (706).

Hanretty indicated that the pain limited Plaintiff's ability to "work, participate in aerobic activity

and maintain [a] normal sleep pattern." (707).   Hanretty continued Plaintiff's medications.

(709).   Regarding Plaintiff's ability to continue working, Hanretty stated: "Due to the patient's

condition, he is finding it difficult to work.   Per his wishes, he will continue to work.   Should

he require, I will be happy to provide an out of work note." (710).   On November 18, 2015, J.

Siddiqui also signed this report. (710).

Just prior to Thanksgiving 2015, Plaintiff concluded that he could not continue working

in his limited role at the machine shop and stopped working altogether. (38).   Regarding his

decision, Plaintiff stated: "[T]hat wasn't really working out.   It was too much for me to stand

or sit, and I just couldn't properly be everywhere I needed to be to show people things, so.").

On January 14, 2016, after Plaintiff's claim for SSDI benefits was denied initially a

hearing was held before an Administrative Law Judge ("ALJ").   At the conclusion of the

testimony the ALJ indicated that he would leave the record open to allow Plaintiff to obtain a

medical opinion from her treating doctor. (57).

On January 19, 2016, Tussing reported that Plaintiff had asked him to complete

disability forms relating to his back condition. (724).   Tussing stated that Plaintiff

> has suffered from low back pain for several years.   The patient did undergo two
> back procedures, the first one in 2003 and the second in 2013.   The patient
> states that he still experiences nerve pain which is always present.   The patient
> currently treats his back pain with prescription medications.

(724).   Tussing further indicated that his examination of Plaintiff had revealed "tenderness to

palpation of the left and ParaVertebral B/L," muscle spasm at L2-S1, an "[a]ntalgic and

flattened deformity" of the lumbar spine and an abnormal gait. (724).   Tussing indicated that

it was appropriate for him to provide a report for Plaintiff since Plaintiff was in fact unable to work, stating, "He's been fighting this for a long time and is unable to continue work due to radiculopathy back pain and neuropathy as well." (725).

More specifically, in his report dated the same date as the office visit, January 19, 2016, Tussing stated that Plaintiff can occasionally or frequently lift only ten pounds; stand and walk less than two hours during a workday; sit less than two hours during a workday; sit thirty minutes before needing to change position; and stand twenty minutes before needing to change position. (674-675). Moreover, Tussing stated that Plaintiff needs to walk around every forty-five minutes for at least ten minutes. (675). Tussing also stated that Plaintiff would need to lie down every ninety minutes, and that his pain would interfere with his ability to concentrate. (675). Tussing additionally opined that Plaintiff's ability to reach and push was affected by his pain, and that Plaintiff should never twist, stoop, crouch or climb ladders. (676). Finally, Tussing indicated that Plaintiff would be absent from work more than three days per month due to his back pain. (677).

On March 4, 2016, after receiving Tussing's report, the ALJ issued a decision fully favorable to Plaintiff, granting him SSDI benefits. However, the Appeals Council, acting *sua sponte*, reversed the ALJ and remanded the matter for new hearing. (15).

On April 5, 2016, J. Siddiqui and Hanretty reported that Plaintiff was complaining of "constant" and worsening low back pain radiating into his left leg. (695, 700). Plaintiff indicated that his current pain level was 8/10, and that it was usually 7/10 and not less than 5/10. (695). Plaintiff reported muscle spasm and difficulty sleeping, "but no difficulty walking." (696). Hanretty reported that Plaintiff's last transforaminal epidural steroid injection into the right lumbar region had provided only "30% of pain relief" for about two weeks. (695).

Upon examination Hanretty reported tenderness around the sacroiliac joint, limited range of motion, pain with motion, normal strength and tone in the lower extremities and positive straight-leg raising bilaterally. (698). Hanretty ordered a further epidural steroid injection under fluoroscopy, "targeting the L4-L5 level and L5-S1 level[s]." (699).

On April 13, 2016, J. Siddiqui administered a lumbar transforaminal block. (686). At that time, J. Siddiqui reported that Plaintiff was complaining of "low back, buttock and bilateral lower extremity pain, right greater than left." (687). Siddiqui recommended that Plaintiff return to see Pollina for a surgical consultation. (688).

On May 4, 2016, Plaintiff reportedly told Hanretty that nerve block treatment had given him "mild" relief (approximately 30% pain relief), which allowed him to increase his activities of daily living somewhat. (680). Plaintiff stated that he could "stand for longer periods of time without pain," and that the addition of Amitriptyline was giving him some benefit. (680). Hanretty reported tenderness to palpation around Plaintiff's sacroiliac joint, limited range of motion and pain with motion and positive straight-leg raising bilaterally. (682). Hanretty's assessment was lumbar radiculopathy, lumbar postlaminectomy syndrome, back pain of lumbosacral region with sciatica and myofascial pain syndrome. (682). Hanretty recommended that Plaintiff continue with his medications and follow up with a surgeon. (683).

On May 17, 2016, Plaintiff's chiropractor, Keith V. Conover ("Conover"), prepared a disability evaluation letter in support of Plaintiff's application for SSDI benefits. (772). Conover noted that he had been treating Plaintiff for nine years. Conover stated that after Plaintiff's second back surgery he had attempted to "return [to work] on a trial light duty basis . . . in the fall of 2015 with shortened hours and light duty restrictions," but that within two months "his average pain level went from frequent 5 to constant 7, occasional-frequent 8/9."

10

(772). Conover indicated that Plaintiff was presently having "a constant pain level of 7 with primary left lumbosacral pain radiating into [the] left gluteal/sacral region." (772). Conover opined that Plaintiff would never be able to return to work "at his prior occupation" and that he was "severely limited in his ability to do any work due to his disability being aggravated by any activity or repetition." (772).

On August 18, 2016, Plaintiff told Tussing that he was attempting to walk more, for exercise, in conjunction with trying to lose weight. (716). In that regard, in addition to the problems with his back Plaintiff was obese and receiving treatment for high cholesterol, esophageal reflux and diabetes. Tussing noted that Plaintiff was continuing to take pain medications for his low back pain, including hydrocodone and gabapentin. (719).

On August 30, 2016, J. Siddiqui wrote to Tussing concerning his recent examination of Plaintiff in connection with his back pain and knee pain. (733). J. Siddiqui noted that Plaintiff was complaining of "increased cramping in the back and leg," and had "state[d] that standing and lifting increase his pain [while] lying down helps to alleviate his pain." (733). J. Siddiqui observed that Plaintiff was "currently utilizing Duloxetine, Gabapentin and Hydrocodone which is providing him with benefit." (733). J. Siddiqui stated that Plaintiff had full strength in his legs, but positive straight leg raising bilaterally. (734). J. Siddiqui further reported that Plaintiff's lumbar paraspinal region was tender to palpation "with palpable paraspinal muscle spasm," reduced range of motion "in all planes," and a "mildly antalgic gait." (734). J. Siddiqui stated that "caudal epidural steroid injection" might be needed in the future, as well as "a trial of trigger point injections in the lumbar paraspinal region." (734). J. Siddiqui further added that, "we may ultimately consider a thoracic spinal cord stimulator in the future." (734). J. Siddiqui noted, though, that Plaintiff had declined his offer of a caudal

epidural steroid injection or a spinal cord stimulator at that time. (734).

On October 25, 2016, J. Siddiqui saw Plaintiff again for a "physiatry re-evaluation" related to Plaintiff's "low back pain with radiation into the bilateral lower extremities." (816). Plaintiff reportedly told J. Siddiqui that his pain was worsening, despite his use of hydrocodone, and that he was willing to consider further intervention to address the pain. (816). Plaintiff indicated that standing and lifting increased his pain. (816). J. Siddiqui reported that Plaintiff had full strength in his lower extremities, positive straight-leg raising bilaterally, tenderness to palpation at the lumbar paraspinal region and sacroiliac area, reduced range of motion in the spine and an antalgic gait. (817). J. Siddiqui's impression was "postlaminectomy syndrome, not elsewhere classified," "radiculopathy, lumbar region" and "low back pain." (817). J. Siddiqui recommended that Plaintiff receive a caudal epidural steroid injection, while continuing to use hydrocodone as needed. (817).

On March 14, 2017, J. Siddiqui reported that Plaintiff was continuing to have lower back pain, but that he had stopped using hydrocodone "as he had concerns for dependency." (803). Plaintiff was interested in pursuing additional treatment options for his back and was also having pain in his left knee. (803). Plaintiff had full strength in his lower extremities, negative straight-leg raising bilaterally, and reduced range of motion in the lumbar spine. (804). J. Siddiqui recommended that Plaintiff have a steroid injection for his knee pain. For Plaintiff's back pain, J. Siddiqui increased the dosage of Duloxetine and again recommended that Plaintiff consider a spinal cord stimulator. (804).

On April 26, 2017, chiropractor Jonathan Beck, DC ("Beck"), evaluated Plaintiff upon a referral from Siddiqui and Hanretty. (856). Plaintiff reportedly told Beck that he was having pain 7/10, with numbness and tingling radiating into both feet. (856). Plaintiff stated that he

had difficulty with "lifting, bending [and] prolong[ed] standing." (856).   During an orthopedic evaluation, Beck reported a number of positive findings, including positive straight-leg raising bilaterally. (857).   Beck's impression was "postlaminectomy syndrome," "radiculopathy, lumbar region," "low back pain," "pain in left knee" and "myalgia." (858).   Beck recommended that Plaintiff pursue a course of chiropractic treatment twice a week for six weeks. (858).

On May 5, 2017, Plaintiff reportedly told Beck that he had stopped taking all pain medication for his back because he had "learned to deal with the constant levels of pain." (853).   Plaintiff stated that his average pain level was 7, sometimes rising to 9. (853).

On July 17, 2017, J. Siddiqui indicated that Plaintiff was continuing to have both knee pain and back pain. (793).   Plaintiff indicated that he was having back pain 7/10, that became worse when standing and better when sitting. (793).   Plaintiff indicated that he was not using "pain medication" and that he had weaned himself off hydrocodone. (793).   However, Plaintiff's reference to "pain medication" was evidently in reference to hydrocodone specifically, since he also told J. Siddiqui that he was still taking "duloxetine for his neurogenic pain complaints." (794).   Nevertheless, Plaintiff indicated that his pain was worsening and that he was interested in trying the spinal cord stimulator. (793).   J. Siddiqui reported that Plaintiff had full strength in his lower extremities, restricted range of movement in the lumbar spine, and normal muscle tone without spasticity. (794).   J. Siddiqui provided Plaintiff with literature about different types of spinal cord stimulators from which to choose. (794).

On October 18, 2017, following the Appeals Council's reversal of the ALJ's award of benefits, a second hearing was held before a new ALJ. (59).   At that time Plaintiff was 49 years of age. (62).   Plaintiff indicated that he had problems with sitting, standing and walking

13

due to back pain. (64).   Plaintiff indicated that he was planning to have a third back surgery, for placement of a spinal neuro stimulator. (64).   Plaintiff indicated that he was not currently taking any "pain medication," and was instead going to try spinal neuro stimulator. (64).   In that regard, Plaintiff stated, "[T]he stuff I was taking didn't feel like it was working for me anymore and I didn't want to go to a harder medication." (65).   However, Plaintiff stated that he was still taking two medications, gabapentin and duloxetine, for "nerve pain." (80). Plaintiff stated that following his spinal surgery in 2013 he attempted to return to work for a "couple of months" in late 2015, but that it became too much for him due to his inability to sit or stand for too long. (67).   Plaintiff further stated that the most he could lift without pain was "15 pounds maybe." (76).   A vocational expert ("VE") testified at the hearing that Plaintiff's past work was classified as "heavy." (89).

On March 1, 2018, the ALJ issued a decision finding that Plaintiff was not disabled at any time between the alleged disability onset date, April 30, 2013, and the last-insured date of December 1, 2018. (15-27).   Applying the five-step sequential evaluation used to analyze disability claims the ALJ found at the first three steps, respectively, that Plaintiff had not engaged in any substantial gainful activity ("SGA") during the relevant period;[6]  that Plaintiff had severe impairments consisting of "degenerative disc disease, status post interbody fusion at L4-5 and obesity"; and that Plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment. (18-19).   Prior to reaching the fourth step of the sequential evaluation the ALJ found that Plaintiff had the following residual functional capacity ("RFC")":

---

[6]  The ALJ found that Plaintiff worked during the third and fourth quarters of 2015, but that such work did not rise to the level of substantial gainful employment. (18).

[T]hrough the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b)[7] except the claimant requires a sit-stand option after one hour. The claimant can occasionally balance, kneel, crouch, crawl or climb ramps or stairs, but can never stoop, squat or climb ladders, ropes or scaffolds.

(20). Then, using that RFC and testimony from the VE, the ALJ found at step four of the sequential evaluation that Plaintiff could not perform his past relevant work. (25). Finally, at the fifth step of the sequential evaluation the ALJ found, again based on the RFC finding and testimony from the VE, that Plaintiff could perform other work, consisting of "mail clerk" and "office helper." (26-27). Consequently, the ALJ found that Plaintiff was not entitled to SSDI benefits.

In making his RFC determination, the ALJ indicated that he considered the evidence of record in accordance with the relevant regulations and found that Plaintiff's statements about his symptoms were "inconsistent" with the record. (21). In other words, the ALJ found that Plaintiff was not credible. On this point, the ALJ began by accurately summarizing Plaintiff's complaints as follows:

The claimant testified he is able to lift 10-15 pounds, stand for 15 minutes, sit for 30 minutes, walk between a half and a whole block. The claimant also reported he has to adjust positions frequently because he has difficulty getting comfortable due to pain. Moreover, he reported he cannot bend, squat or reach due to his radicular pain which also interrupts his sleep at night. Finally, the claimant testified that he is compliant with treatment recommendations and prescribed medications but despite compliance continues to experience the resultant symptoms which have worsened in frequency, intensity and duration[.]

---

[7] "Light work. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567.

(21) (citations to record omitted).   However, the ALJ asserted that Plaintiff's activities of daily living were inconsistent with his statements about his symptoms, since those activities "require[d] significant physical and mental demands, which are not consistent with the level of limitation the claimant alleges." (21).   The ALJ further indicated that Plaintiff's limited work activity during the third and fourth quarters of 2015, while below the level of SGA, showed that Plaintiff's "daily activities have, at least at times, been somewhat greater than the claimant has generally reported." (21).   The ALJ additionally     stated that the "objective evidence also reflects that the claimant is not as limited as alleged." (22).   In that regard, the ALJ asserted that the medical evidence showed "grossly normal clinical findings" and a failure by Plaintiff to pursue treatment. (22).

With regard to medical opinion evidence, the ALJ asserted that he considered such evidence in accordance with 20 CFR 404.1527, and that "the record does not contain any opinions from treating or examining physicians that identify any objective medical findings to support a conclusion indicating that the claimant was disabled or has limitations greater than those determined in this decision." (23).   Of particular note, the ALJ gave only "partial weight" to the opinion of Plaintiff's long-time treating physician, Tussing.   More specifically, the ALJ accepted Tussing's opinion insofar as it indicated that Plaintiff could not perform his *past* work. (24).   However, the ALJ rejected Tussing's opinion regarding Plaintiff's ability to sit, stand and walk (which would effectively prevent Plaintiff from performing even sedentary work), and his opinion that Plaintiff would miss three or more days of work per month, stating:

> [T]he record does not support the limitations as opined, given his grossly normal clinical findings upon examination in gait, station, sensation, and negative straight leg raises as detailed above.   Finally, by the claimant's self

16

reported activities and abilities, the record show sitting helps alleviate pain, which warrants the sit-stand option as detailed above. Accordingly, the opinions of Dr. Tussing are given partial weight at the record as a whole does not support greater limitations than accorded in the residual functional capacity.

(24).

On the other hand, the ALJ found that the consultative opinion of A. Siddiqui, who examined Plaintiff once on October 25, 2013, (more than five years prior to Plaintiff's last-insured date) was entitled to "great weight." (24). In that regard, the ALJ observed that the opinion was

rendered by an acceptable medical source with program knowledge and supported by a detailed examination. Furthermore, the opinion is consistent with the correlating clinical findings, which were rendered post-surgery. Finally, the results are also consistent with the longitudinal treatment records as outlined above which reflect improvement since surgical intervention, including grossly normal musculoskeletal clinical findings upon examination in gait, station, sensation, and strength as well as the MRI of February 2017. As such, great weight is accorded to this opinion.

(24).

On August 29, 2018, Plaintiff commenced this action, and on September 11, 2019, he filed the subject motion [#15] for judgment on the pleadings. On November 7, 2019, Defendant filed the subject cross-motion [#17][8] for judgment on the pleadings. As discussed more fully below, the Court has considered the parties' submissions and the entire record.

STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of

---

[8] Defendant's papers incorrectly state that Plaintiff previously worked as an electrician. Docket No. [#17-1] at p. 4.

Social security as to any fact, if supported by substantial evidence, shall be conclusive." The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation omitted).

> The substantial evidence standard is a very deferential standard of review—even more so than the 'clearly erroneous' standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder would have to conclude otherwise." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original). "An ALJ is not required to discuss every piece of evidence submitted, and the failure to cite specific evidence does not indicate that such evidence was not considered. *Id.*

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), as amended (Apr. 30, 2019) (internal quotation marks omitted).

In applying this standard, a court is not permitted to re-weigh the evidence. *See, Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) ("Krull's disagreement is with the ALJ's weighing of the evidence, but the deferential standard of review prevents us from reweighing it."); *see also, Riordan v. Barnhart*, No. 06 CIV 4773 AKH, 2007 WL 1406649, at *4 (S.D.N.Y. May 8, 2007) ("The court does not engage in a *de novo* determination of whether or not the claimant is disabled, but instead determines whether correct legal standards were applied and whether substantial evidence supports the decision of the Commissioner.") (citations omitted).

<u>The ALJ Mischaracterized the Record When
Evaluating Plaintiff's Credibility</u>

As discussed further below, Plaintiff contends that the ALJ committed legal error in

various ways in connection with the evaluation of the medical opinion evidence. However, before even reaching that argument the Court observes that the ALJ's discussion of the medical evidence, in connection with his evaluation of Plaintiff's credibility, was inaccurate and/or incomplete in several respects.

As mentioned earlier, the ALJ found that Plaintiff was not credible since his statements about his symptoms were "inconsistent" with the record in at least three ways. (21). First, the ALJ stated that Plaintiff's statements about his symptoms were inconsistent with his activities of daily living, since those activities "require[d] significant physical and mental demands, which are not consistent with the level of limitation the claimant alleges" (21). In particular, the ALJ mentioned that Plaintiff "is able to tend to *her* [sic] personal hygiene, prepare simple meals, engage in household chores, visit with friends and family, shop, use a computer, read for pleasure, handle finances, watch television, get along adequately with others, and maintain the ability to operate a motor vehicle." (21). However, apart from incorrectly identifying Plaintiff as a female, this statement exaggerates Plaintiff's stated ability to perform "household chores." In fact, Plaintiff stated that he generally *cannot* perform "yard and house work," and that his wife and adult stepdaughter generally perform all household chores. (303, 77). There is no contrary evidence in the record. At most, Plaintiff stated that despite his limitations he can still "change laundry" and perform "minor cleaning" (305), but the exact nature of those activities was never explored. It is the Court's recollection of the evidence that, apart from stating that he went shopping for an hour once per week "to get out of the house," Plaintiff indicated that his daily activities primarily consist of watching television, using the computer, reading and napping, which are not indicative of an ability to

engage in sustained full-time work.[9]

Second, the ALJ asserted that Plaintiff's less-than-SGA work activity during the fall of 2015 further showed that his "daily activities have, at least at times, been somewhat greater than the claimant has generally reported." (21). However, this reference to "work activities" is vague and again seems to exaggerate the actual record. The record indicates that immediately after Plaintiff's second back surgery, he was anxious to return to his usual work, but that he and Pollina eventually concluded that he was unable to do so. After being out of work for more than a year, Plaintiff attempted to return to his workplace in a limited capacity, but ultimately concluded that even that modified job (which his employer had created specially to accommodate his limitations) was too physically taxing. Under these circumstances it was not appropriate for the ALJ to use this attempt-at-work to make a negative credibility finding against Plaintiff, particularly when the ALJ did not explain exactly which of the work activities that Plaintiff performed in 2015 were supposedly inconsistent with Plaintiff's statements about his symptoms.

Third and finally, the ALJ asserted that the "objective [medical] evidence" "reflects that the claimant is not as limited as alleged," since it reveals benign examination findings and a failure by Plaintiff to pursue treatment. (22). In particular, the ALJ refers to a "negative straight leg raise" test; a finding of "no lower extremity weakness or radicular pain, numbness or tingling"; "no evidence of tenderness to palpation"; and a "gap in treatment" during which Plaintiff did not "follow up" "with Pollina for quite some time." (22). The ALJ then purports to support his statement about the supposedly "normal clinical findings" by offering his own

_____

[9] *See, e.g.*, First AL Hearing (42) (Plaintiff indicated that he watches television eight or nine hours per day, and spends one hour on the computer).

opinions and interpretations of certain raw medical evidence in the record. (22). Once again, though, the ALJ's description of the record is not entirely accurate. Indeed, to support his credibility finding, the ALJ focused on a few positive findings while ignoring a large amount of contrary evidence. For example, the ALJ refers to a single negative straight-leg raising test while ignoring numerous *positive* straight-leg raising tests observed following Plaintiff's 2013 surgery, as set forth above.[10] Similarly, the ALJ's suggestion that Plaintiff did not have "radicular pain, numbness or tingling" following his 2013 surgery is simply incorrect.[11] Indeed, Pollina expressly opined that while the 2013 surgery had been successful in fusing Plaintiff's spine at L4-L5, it had also apparently aggravated the surrounding areas of his spine, resulting in neuropathic pain, which was the reason he referred Plaintiff to J. Siddiqui for pain management. The ALJ's assertion that there was "no evidence of tenderness to palpation" is also incorrect.[12]

Further as to this same point, the ALJ asserted that there was a "gap in treatment" during which Plaintiff did not see Pollina, and that this gap reflected negatively on Plaintiff's credibility. (22). However, there was no such gap. Rather, Pollina, who is a surgeon, indicated that there was nothing more surgically that he could do for Plaintiff, which is why he referred Plaintiff to J. Siddiqui for pain management. (580). Hence, there was no reason for Plaintiff to continue seeing Pollina.[13]

---

[10] See, e.g., Transcript at pp. 682, 698, 734, 817, 857. Moreover, the record clearly indicates that there was no necessary correlation between the results of Plaintiff's straight-leg-raising tests and the severity of his pain, contrary to what the ALJ suggests. Rather, that is an example of the ALJ substituting his lay opinion for competent medical opinion.

[11] See, e.g., Transcript at pp. 587, 695, 706.

[12] *See, e.g.*, Transcript at pp. 652, 655, 724, 734, 698.

[13] The ALJ's reference to a "gap" was based on statement in a letter from J. Siddiqui to Tussing, dated June 23, 2016, in which Siddiqui noted that Plaintiff "has not followed back up with Pollina for quite some time." (739). However, as already noted Pollina had already indicated that there was nothing more surgically that he could do

In sum, the Court finds that a remand is warranted since the ALJ's credibility determination rests on a variety of unsupported, selective and/or inaccurate statements about the record.

<u>The ALJ Did Not Correctly Evaluate the Medical Opinion Evidence</u>

Plaintiff also contends that remand is required because the ALJ erred in his assessment of the medical opinion evidence.   The Court agrees.

First, Plaintiff contends that that the ALJ "misrepresented" Tussing's opinion.   The Court agrees that the ALJ mischaracterized Tussing's opinion insofar as he indicated that such opinion was inconsistent with the record as a whole.   On this point, the ALJ asserted that

> the record does not support the limitations as opined [by Tussing], given [the claimant's] grossly normal clinical findings upon examination in gait, station, sensation, and negative straight leg raises[.]   Finally, by the claimant's self-reported activities and abilities, the record shows sitting helps alleviate pain, which warrants the sit-stand option as detailed above.   Accordingly, the opinions of Dr. Tussing are given partial weight as the record as a whole does not support greater limitations than accorded in the residual functional capacity.

(24).   However, in this regard the ALJ is merely repeating the same inaccuracies (regarding "clinical findings" and "activities and abilities") that he made when discussing Plaintiff's credibility, as discussed earlier.   In sum, insofar as the ALJ gave less than controlling weight to Tussing's opinion because it supposedly was inconsistent with the record as a whole, the ALJ's determination is not supported by substantial evidence.

_____

for Plaintiff.   Siddiqui may have been referring to the fact that in April 2016 he suggested that Plaintiff seek a *new* surgical consult with Pollina since the pain treatments that Siddiqui was providing were not adequately controlling Plaintiff's pain. (683, 688).

Further, although the ALJ was correct to note that there were some normal clinical findings, he is not medically qualified to interpret the raw medical findings in the record. Therefore, it was error for him to rely on his own lay interpretation of the medical record to discredit Tussing's opinion.

Plaintiff also maintains that the ALJ erred in granting great weight to the consultative examiner's opinion. The Court again agrees, since the ALJ's decision to grant "great weight" to the consultative examiner's opinion rests on the same inaccuracies that the Court identified earlier. In particular, the ALJ asserted that the consultative examiner's opinion was entitled to great weight in part because it was "consistent with the correlating clinical findings, which were rendered post surgery." (24). However, the ALJ has not accurately portrayed those "clinical findings," as already explained. Indeed, in his discussion of the opinion evidence the ALJ incorrectly suggests that the medical evidence shows that Plaintiff's spinal problem was essentially resolved by the 2013 surgery as shown by subsequent clinical findings that were "grossly normal."[14]

Additionally, and putting aside the fact that the consultative examiner's report was based on a single brief examination, the consultative examiner's opinion was stale and incomplete in scope. In that regard, the consultative examination was performed on October 25, 2013, more than five years prior to Plaintiff's last-insured date (546), and consequently did not take into account changes in Plaintiff's condition that occurred following the consultative exam. Indeed, months after the consultative examination Pollina reported that

_____

[14] (24) (The ALJ described the consultative examiner's opinion as being "consistent with the longitudinal treatment records as outlined above which reflect improvement since surgical intervention, including grossly normal musculoskeletal clinical findings[.]").

Plaintiff was having pain "most days," which Pollina attributed to post-surgical changes in the "biodynamics" of Plaintiff's spine. (588) ("[T]he additional fusion level [has likely] changed [Plaintiff's] biodynamics in his lumbar spine and his adjacement segments are likely contributing to his current pain."). Pollina subsequently referred Plaintiff to J. Siddiqui for pain management treatment, and Siddiqui later diagnosed Plaintiff with post-laminectomy syndrome.[15] (682-683, 817).

For all of these reasons the Court finds that the ALJ's evaluation of the medical opinion evidence was erroneous and requires a remand.

CONCLUSION

Plaintiff's motion for judgment on the pleadings [#15] is granted, Defendant's motion [#17] is denied, and this matter is remanded to the Commissioner for further administrative proceedings consistent with this Decision and Order. The Clerk of the Court is directed to enter judgment for Plaintiff and close this action.

So Ordered.

Dated: Rochester, New York
       March 16, 2020

ENTER:


/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge

---

[15] Although Tussing wrote his report prior to Dr. Jafar Siddiqui's diagnosis of post-laminectomy syndrome, he was aware when he wrote the report of the facts upon which Siddiqui eventually made that diagnosis, namely, that Plaintiff's condition had worsened following the surgery in 2013.